## ILLINOIS CENTRAL RAILROAD COMPANY *v.* CHICAGO.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 114. Argued January 24, 25, 1900. — Decided March 12, 1900.

The charter of the Illinois Central Railroad Company authorized it to " enter upon and take possession of and use all and singular any lands, streams and materials of every kind for the location of depots and stopping stages for the . . . complete operation of said road; " and granted to it " all such lands, waters, materials and privileges belonging to the State." A subsequent ordinance of the city of Chicago, passed in pursuance of authority granted by the legislature, forbade the driving or placing of any piles, stone, timbers or other obstruction in the harbor of the city, without the permission of the commissioner of public works. *Held:* that a Federal question was presented whether this ordinance impaired or interfered with the charter of the railroad company.

*Held* further, that, under its charter, the railroad company had no right to take possession of lands submerged beneath the waters of Lake Michigan. *Held,* also, that the " waters" granted to the railroad company in the second part of the granting clause, were restricted to the " streams " mentioned in the first part, and did not include the waters of Lake Michigan.

Under another section of the charter, providing that the corporation should not locate its track within any city without the consent of the common council, *held,* that this proviso was not confined to the main track of the road, but included its depots, engine houses and necessary track approaches to the same.

This restriction was not limited to the city as bounded at the date of the charter, but applied also to territory subsequently included within the city limits.

THIS was a bill in equity instituted by the Illinois Central Railroad Company in the Superior Court of Cook County, to obtain an injunction restraining the city of Chicago from interfering with the exercise of the right of the railroad company to fill in, for railroad purposes, certain lands submerged by the shallow waters of Lake Michigan in front of property owned by the railroad company, in fee, and situated between Twenty-fifth and Twenty-seventh streets in said city. The purpose of the railroad company in reclaiming the land was to erect thereon an engine house and locomotive stalls necessary to the operation of the road.

The case was heard upon bill, answer, cross bill and demurrer to cross bill, in which were set forth substantially the following facts, as recited in the opinion of the Supreme Court, 173 Illinois, 471:

By an act of Congress approved September 20, 1850, 9 Stat. 466, c. 61, "the right of way through the public lands was granted to the State of Illinois for the construction of the railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi rivers, with a branch of the same to Chicago, on Lake Michigan, and another via the town of Galena, in said State, to Dubuque, in the State of Iowa, with the right, also, to take the necessary lands, waters and materials of earth, stones, timber, etc., for the construction" of the railroad. The act also granted to the State of Illinois, for the purpose of aiding and making the railroad and branches above named, every alternate section of land designated by even numbers, for six sections in width, on each side of the railroad and branches. By the act it was further provided that the railroad and branches should be and forever remain a public highway for the use of the Government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States.

The company was created, organized under and now exists, by virtue of an act of the legislature of the State of Illinois approved February 10, 1851, entitled "An act to incorporate the Illinois Central Railroad Company," Private Laws of 1851, p. 61, and by its charter it was authorized to survey, locate, construct, complete, alter, maintain and operate a railroad, with one or more tracks or lines of rail, from the southern terminus of the Illinois and Michigan Canal, to a point at or near the junction of the Ohio and Mississippi rivers, with a branch of the same into Chicago, on Lake Michigan, and also a branch via the city of Galena to a point on the Mississippi River opposite the town of Dubuque, in the State of Iowa. By section 3 of its charter it was provided as follows: "The said corporation shall have right

of way upon, and may appropriate to its sole use and control for the purposes contemplated herein, land not exceeding 200 feet in width through its entire length; may enter upon and take possession of and use all and singular any lands, streams and materials of every kind, for the location of depots and stopping stages, for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turnouts, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. All such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes; but when owned or belonging to any person, company or corporation, and cannot be obtained by voluntary grant or release, the same may be taken and paid for, if any damages are awarded, in the manner provided in 'An act to provide for a general system of railroad incorporation,' approved November 5, 1849, and the final decision or award shall vest in the corporation hereby created all the rights, franchises and immunities in said act contemplated and provided; . . . *Provided*, that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams."

The bill also avers that the company constructed its line of railroad within the then limits of the city of Chicago in the year 1852, and completed its railroad between the *termini* named in its charter, in the State of Illinois, in the year 1857; that the total number of miles of its railroad in the State, upon completion, was 706; that at the time of the construction of its railroad, in 1852, into the city of Chicago, the southern limits and boundary of the city extended only to Twenty-second street; that in 1852 it constructed its line of railroad immediately along the shore and partly over the shallow waters of Lake Michigan from Fifty-first street to Twenty-second street, then the southern boundary of the city, and that its railroad was constructed into the city of Chicago through the waters of Lake Michigan, pursuant to an

ordinance of the city; that its railroad within the limits of the city was constructed on piling set in the open waters of Lake Michigan east of the shore; that between Park Row and Randolph street the distances in a direct east and west line between the shore line and the inner or west line of the piling on which the railroad of the company was constructed through the open waters of Lake Michigan varied from 5 feet at Park Row to 310 feet at Madison street, and that the depth of the water along the line of piling between the points above named varied from $2\frac{1}{2}$ to $9\frac{1}{2}$ feet; that the company now owns or controls by lease, and is now operating under one management, the whole of the trunk line as one continuous line from New Orleans, through the States of Louisiana, Mississippi, Tennessee, Kentucky and Illinois, into the city of Chicago; that it controls, by lease or otherwise, under the same management, many other lateral lines in the States above named, and also in the States of Wisconsin, Iowa, Minnesota and Dakota, which connect with and are tributary to the parent line of the company; that the number of miles now owned or controlled by the company under one management exceeds 4600.

It is further alleged in the bill that the city of Chicago is the business centre of the various lines which constitute the system owned by the company; that the business carried on over the terminal tracks and facilities of the company within the present limits of the city of Chicago is so great and so constantly increasing that the whole of its right of way and lands contiguous thereto, within said limits, are used to their utmost capacity as yards, shops, depot grounds, side tracks, switching tracks, storage tracks, delivery tracks, team tracks and other structures, all of which are absolutely necessary as terminal facilities to enable the company to carry on and conduct its business as a common carrier of freight and passengers, and that all the tracks, structures and appliances of its terminal facilities are necessary and essential to enable the company to carry on its business; that the business of the company as a common carrier greatly increases from year to year, and that it has so continued to increase that its terminal

facilities in the city are not wholly adequate for the purposes
and uses prescribed and intended by its charter. The bill
sets out in detail its business and its increase from year to
year, and alleges that its terminal facilities in the city of
Chicago have been found to be wholly inadequate to enable
the company to carry on its business; that in order to meet
the increased business necessities and requirements of the
company it is absolutely necessary that the company should
construct, operate and use an engine house 316 feet in diame-
ter, and containing forty stalls, together with a machine
shop, turn table, coal chute and other structures; that it has
no engine house whatever at which it is practicable for its
engines to be overhauled and fitted for operation; that it has
no land whatever unoccupied by other necessary tracks and
structures, which is either sufficient in dimensions or suitably
located, upon which to locate and construct an engine house
of the necessary dimensions and capacity, with the necessary
appurtenances thereto, required and necessary for the business
of the company, and that in order to build such engine house
and the appurtenances it is necessary to construct the same
upon land covered by the shallow waters of Lake Michigan,
at a point between Fifty-first street and Eighteenth street.

It is also set up in the bill that, in 1852, at the time of the
construction of the road within the city of Chicago, it pur-
chased certain lands lying between Twenty-fifth and Twenty-
seventh streets, bordering on the shore of Lake Michigan;
that in the deeds the shore of Lake Michigan was desig-
nated as the east boundary line thereof, and that the com-
pany, as owner, was vested with all the riparian rights and
privileges incident to the ownership in fee of the shore land;
that in the year 1882 it constructed a breakwater or bulkhead
in the shallow waters of Lake Michigan, the same being lo-
cated and constructed in front of the land which the company
purchased in 1852, above referred to, the east and west line
of the breakwater on the north extending from a point on
the shore continuous with the northern boundary of the land
conveyed to the company in 1852, and extending to a point
200 feet easterly from the shore line, running thence southerly

a distance of 781 feet, and thence westerly to the shore line, a distance of 325 feet; that the breakwater built by the company in 1882 was constructed on two rows of piling driven into the bed of Lake Michigan, and the space between the rows of piling was filled in with stone, in order to strengthen the breakwater and enable it to withstand the force of Lake Michigan during periods of storm; that all the shore land embraced within the lines of the breakwater now is, and ever since the year 1852 has been, owned in fee simple by the company, and that it is entitled to all the riparian rights and privileges incident to the ownership in fee of the shore land; that the superficial area of the land covered by the shallow waters of Lake Michigan lying within the lines of the breakwater and the shore line of Lake Michigan is 195,200 square feet, or 4.48 acres; that the superficial area of the ground necessary for the construction of the engine house, machine shop, coal chute and other necessary structures appurtenant thereto is 168,426.9 square feet, or 3.86 acres.

The bill further states that in the year 1894 a part of the breakwater referred to as having been constructed by it in the year 1882 was destroyed by a storm on Lake Michigan; that it being necessary, to enable the company to carry on and conduct its business, that an engine house of sufficient capacity to meet its necessary requirements and demands in conducting its business and to accomplish the objects for which the company was chartered, be constructed and erected at a reasonably suitable and proper location, and it being necessary that such engine house should be erected and constructed upon the lands submerged by the shallow waters of Lake Michigan lying in front of land on the shore of Lake Michigan owned in fee simple by the company, the company caused plans to be made, as before stated, for an engine house 316 feet in diameter, and containing forty stalls or compartments, and under the power, authority and right given and vested in the company by its charter, and in the exercise of its rights as riparian owner, it elected and determined to locate and construct said engine house on land submerged by the shallow waters of Lake Michigan lying within the limits of

the breakwater, and to repair the breakwater and fill in the submerged lands lying within the limits of the breakwater, for the purpose of constructing thereon said engine house and the necessary appurtenances thereto; that the breakwater does not in any way interfere with the navigation of Lake Michigan; that the Secretary of War gave his consent to the repair of the breakwater; that the commissioner of public works of the city of Chicago also gave his consent to the repair; that the company placed upon the ground large quantities of material for repairing the breakwater, the filling in of the lands covered by the shallow waters of Lake Michigan embraced within the lines thereof, and for the construction of the engine house and appurtenances thereto on the lands to be filled in; that it repaired the breakwater by driving two rows of piling, and filled in a large part of the space between the exterior and interior line of piling with stone, for the purpose of enabling the breakwater to withstand the force of Lake Michigan; that the company was prevented by the police force of the city of Chicago, acting under the orders and direction of the mayor, from completing the work; that the city of Chicago, without right or authority, interferes with and prevents the company from filling in the lands within the lines of such breakwater.

The answer of the city set up its charter and authority under an act of the General Assembly of the State of Illinois, entitled "An act to provide for the incorporation of cities and villages (approved April 10, 1872, in force July 1, 1872)," and the several acts amendatory thereof and supplementary thereto, and that, among other things, it was "empowered to regulate and control the use of public landing places for docks and levees; to control and regulate the anchorage, moorage and landing of all water crafts and their cargoes; to make regulations in regard to the use of harbors, and to appoint harbor masters and define their duties, and that in the exercise of such power this defendant has, through its police power, prevented the said complainant hitherto from filling up the said lake and intruding upon the navigable waters thereof, and that all the acts and doings complained of as done and per-

formed by this defendant, its officers, agents and employés, have been done strictly in the line of its duty in that behalf for the purpose of protecting its own rights and the rights of the public generally, in the premises, so as to prevent obstructions in the harbor and the seizure and appropriation by the complainant of the bed and navigable waters of the said lake;" and also pleaded the decision of this court in *Illinois Central Railroad Co.* v. *Illinois,* 146 U. S. 387, as *res judicata* of all the questions in controversy. The cross bill prayed a counter injunction against any interference by the railroad company.

Upon a hearing upon these pleadings the Superior Court denied the injunction demanded by the railroad company and dismissed its bill. On appeal the Supreme Court affirmed this decree. 173 Illinois, 471. Whereupon the railroad company sued out a writ of error from this court.

*Mr. William D. Guthrie* for plaintiff in error. *Mr. Benjamin F. Ayer* and *Mr. James Fentress* were on his brief.

*Mr. Granville W. Browning* for defendant in error. *Mr. Charles M. Walker* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The Supreme Court of Illinois disposed of this case upon two grounds: (1) That the power given by the charter of the Illinois Central Railroad Company of February 10, 1851, to "enter upon and take possession of and use all and singular any lands, streams and materials of every kind, for the location of depots and stopping stages for the . . . complete operation of said road," and the grant to said corporation of "all such lands, waters, materials and privileges belonging to the State," did not include lands covered by the waters of Lake Michigan. (2) That, even if the grant were broad enough to include the waters of the lake, it did not follow that the railroad company would have the right, at any time it might see proper, to take and appropriate to itself any of the lands cov-

ered by such waters, provided only that the navigation of the lake was not interferred with.

1. The ultimate jurisdiction of this court is invoked by the allegation of the bill that the above provision of the railway's charter was and is an irrevocable contract between the State of Illinois and the complainant, conferring upon it "a vested and continuing right to use the shallow waters and submerged lands of Lake Michigan for such purposes, when such use is reasonably necessary for the business of your orator; provided, that the same does not interfere with the navigation of the lake, having reference to the manner in which commerce is conducted thereon"; and that "any law of the State of Illinois, or any judgment, decree or decision of any court or tribunal thereof, which denies or in any way impairs its right to use the submerged land of Lake Michigan for the purpose of constructing and using engine houses, shops and other buildings thereon, etc., impairs the obligation of the contract created by said charter," etc.

The answer of the city avers that, under an act of the General Assembly of the State, approved April 10, 1872, it was empowered "to regulate and control the use of public landing places for docks and levees; to control and regulate the anchorage, moorage and landing of all water crafts and their cargoes; to make regulations in regard to the use of harbors, and to appoint harbor masters and define their duties, and that in the exercise of such power this defendant has, through its police power, prevented the said complainant hitherto from filling up the said lake and intruding upon the navigable waters thereof;" and that the city was also empowered to regulate its police, and pass and enforce all necessary police ordinances; and that in pursuance of this authority the city council made and established an ordinance (793) that "no person or persons shall drive or place or cause to be driven or placed any pile or piles, stone, timbers earth or other obstruction in the harbor of the city without the permission of the commissioner of public works," etc.

This was the only authority claimed in the answer, but as all this legislation was subsequent to the charter of the railroad

company, the city now sets up in support of its motion to dismiss for want of a Federal question that it was provided in section eight of the railroad's charter of 1851, that "nothing in this act contained shall authorize said corporation to make a location of their track within any city, without the consent of the common council of such city," and that this section operates as a restriction upon the power of the railroad to locate its track, or other structures, depots, engine houses or otherwise, over any lands contiguous to the city under Lake Michigan, or any other public property over which the police power of the city extends.

It is also insisted that the city had, in 1851, even greater powers over the submerged lands on its lake front under its charter than it has now; but the only support for this contention lies in an amended charter of the city of Chicago, passed February 14, 1851, four days *after* the charter of the Illinois Central Railroad Company was adopted. As this was a subsequent act, it is impossible to argue from it that the police power of the city at the date of the charter was as ample as that conferred by the act of April 10, 1872, set up in the answer. The extract to which attention is called by counsel, from the opinion of the Supreme Court of Illinois in *Illinois Central Railroad* v. *Rucker*, 14 Illinois, 353, 356, to the effect that under the charter of the city of Chicago the common council was empowered to regulate, control and protect the bed and waters of the lake as a part of the city of Chicago, may have been, and probably was, based upon the act of February 14, 1851, and, in any event, is too indefinite to be made the basis of any adjudication as to the power of the common council.

We have examined the first charter of the city of Chicago, adopted March 14, 1837, and the amendments thereto, down to the charter of February 14, 1851, and find nothing prior to the last-mentioned date defining the powers of the common council over the waters of Lake Michigan adjacent to the city, or anything from which it can be argued that the authority of the common council, with respect to the harbor and adjacent waters, was as ample as that conferred by the acts of the Gen-

eral Assembly subsequent to the chartering of the railroad company.

The question then is reduced to this: Giving to the charter of the railroad company the broadest construction claimed by it (and, in determining the existence of a Federal question, we are bound to do this), may it not be reasonably insisted that, under the act of 1872 and ordinance No. 793, that "no person or persons shall drive or place or cause to be driven or placed any pile or piles, stone, timbers, earth or other obstruction in the harbor of the city without the permission of the commissioner of public works," the right of the railroad company "to enter upon and take possession of and use all and singular lands, streams and materials of every kind for the complete operation of the road," is impaired? We think it may. Without determining the effect of such ordinance, the question whether it impairs the charter of the company, giving to that charter a broad construction, is fairly open to contention. *Bacon* v. *Texas,* 163 U. S. 207, 216; *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 5, 10. The claim is certainly not a frivolous one. In determining the existence of a Federal question it is only necessary to show that it is set up in good faith and is not wholly destitute of merit. Said Chief Justice Chase in *Millingar* v. *Hartupee,* 6 Wall. 258, 261, speaking of the validity of an authority exercised under the United States: "Something more than a bare assertion of such authority seems essential to the jurisdiction of this court. The authority intended by the act is one having a real existence, derived from competent governmental power. If a different construction had been intended, Congress would doubtless have used fitting words. The act would have given jurisdiction in cases of decisions against claims of authority under the United States. . . . If a right were claimed under a treaty or statute, and on looking into the record it should appear that no such treaty or statute existed or was in force, it would hardly be insisted that this court could review the decision of a state court that the right claimed did not exist." So in *New Orleans* v. *New Orleans Water Works Co.,* 142 U. S. 79, we held that the bare averment of a Federal question is not always sufficient; that such aver-

ment must not be wholly without foundation, since if it were otherwise a Federal question might be set up in almost every case, and the jurisdiction of this court invoked simply for the purpose of delay.

But as we are of opinion that the Federal question in this case was properly set up in the record, and is not destitute of merit, the motion to dismiss must be denied.

2. Upon the merits, the case turns upon the proper construction of the charter of the Illinois Central Railroad Company, granted by the General Assembly, February 10, 1851. As was said in the case of *Walsh* v. *Columbus, Hocking Valley & Athens Railroad Company, ante,* 469, and the prior cases therein cited, whenever a contract created by a state statute is alleged to have been impaired by subsequent legislation, it is for this court to determine the proper construction of such statute, as well as the question whether the subsequent legislation has impaired it.

The sections of the charter upon which the railroad company relies for taking possession of this property, so far as the same are pertinent to this case, are as follows:

" Sec. 3. The said corporation shall have right of way upon, and may appropriate to its sole use and control, for the purposes contemplated herein, land not exceeding two hundred feet in width through its entire length ; *may enter upon and take possession of and use all and singular any lands, streams and material of every kind, for the location of depots and stopping stages,* for the purpose of constructing bridges, dams, embankments, excavations, station grounds, spoil banks, turnouts, engine houses, shops and other buildings necessary for the construction, completing, altering, maintaining, preserving and complete operation of said road. *All such lands, waters, materials and privileges belonging to the State are hereby granted to said corporation for said purposes;* but when owned or belonging to any person, company or corporation, and cannot be obtained by voluntary grant or release, the same may be taken and paid for, if any damages are awarded, in the manner provided in ' An act to provide for a general system of railroad incorporations,' approved November fifth,

one thousand eight hundred and forty-nine; and the final decision or award shall vest in the corporation hereby created all the rights, franchises and immunities in said act contemplated and provided; . . . *Provided*, that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams."

"Sec. 8. . . . Nothing in this act contained shall authorize said corporation to make a location of their track within any city, without the consent of the common council of said city."

"Sec. 10. Said corporation may construct their said road and branches over or across any stream of water, watercourse, road, highway, railroad or canal, which the route of its road shall intersect, but the corporation shall restore the stream or watercourse, road or highway, thus intersected, to its former state, or in a sufficient manner not to have impaired its usefulness. . . ."

"Sec. 15. . . . *Third.* — That said company shall proceed to locate, survey and lay out, construct and complete said road and branches, through the entire length thereof, . . . with a branch also diverging from the main track at a point not north of the parallel of thirty-nine and a half degrees north latitude, and running on the most eligible route into the city of Chicago, on Lake Michigan. That the central road or main track shall be completed, with at least one line of rails, or single track, with the necessary turnouts, stations, equipments and furnishings, within four years from the date of the execution of said deed of trust, and the branches within six years from the said date."

The position of the railroad company under these sections, presupposing as it does a vested, continuing and irrevocable right for all time, to use such of the shallow waters and submerged lands of Lake Michigan as it may now or hereafter find to be necessary to the proper and complete operation of its road, and a surrender by the city of all power of interference, is certainly a somewhat startling one. It is no matter of surprise that the magnitude of the claim should have at once aroused the authorities of the city to inquire into its soundness.

Under the law of the State of Illinois, as laid down by the Supreme Court, not only in the case under consideration, but in the prior case of *People* v. *Kirk,* 162 Illinois, 138, 146, " the State holds the title to the lands covered by the waters of Lake Michigan lying within its boundaries, but it holds the title in trust for the people, for the purposes of navigation and fishery. The State has no power to barter and sell the lands as the United States sells its public lands, but the State holds title in trust in its sovereign capacity, for the people of the entire State."   Such was also the ruling of this court in a case between the same parties, *Illinois Central Railroad* v. *Illinois,* 146 U. S. 387, affirming *Illinois* v. *Illinois Central Railroad,* 33 Fed. Rep. 730.   This, too, is a question of local law with regard to which the decisions of the state courts are conclusive.   *Packer* v. *Bird,* 137 U. S. 661; *Hardin* v. *Jordan,* 140 U. S. 371.

But we are now asked to say that, not the State, but a railway company, is vested with a power which, in the course of time and in the increasing magnitude of its business, may enable it to do, by indirection or piecemeal, what it has been held the State could not do directly — take the whole water front of the city to the limit of navigation for the operation of the road, and that, too, without the consent and against the protest of the city.   If such authority be possible, it should be granted in the clearest and most unmistakable language.

But on examining section three of the charter — the source of this almost unlimited power — we find that, so far from its being conferred in precise and definite words, the implication is clearly against the power claimed.   In fact, it is only by a strained and unnatural construction that any intention on the part of the legislature to abdicate its authority over the submerged lands of Lake Michigan can be raised.

Referring to the particular language of the grant in that section, it is manifest that such authority must arise either from the right given " to enter upon and take possession of and use all and singular any *lands, streams* and materials of every kind," etc., or from the grant of " all *such lands, waters,* materials and privileges belonging to the State."

We do not question the general principle that the word "lands" includes everything which the land carries or which stands upon it, whether it be natural timber, artificial structures or water, and that an ordinary grant of land by metes and bounds carries all pools and ponds, non-navigable rivers and waters of every description by which such lands, or any portion of them, may be submerged, since, as was said by the court in *Regina* v. *Leeds & Liverpool Co.*, 7 Ad. & El. 671, 685: "Lands are not the less land for being covered with water." See also *Brocket* v. *Ohio &c. Railroad*, 14 Penn. St. 241; *Beckman* v. *Kreamer*, 43 Illinois, 447; *Hooker* v. *Cummings*, 20 Johns. 90; *State* v. *Pottmeyer*, 33 Indiana, 402; *Rex* v. *Wharton*, Cas. Temp. Holt, 499; *S. C.* 12 Mod. 510; *Buckingham* v. *Smith*, 10 Ohio, 288; *Mill River Woollen Mfg. Co.* v. *Smith*, 34 Connecticut, 462; *Waters* v. *Lilley*, 4 Pick. 199; *Washington Ice Co.* v. *Shortall*, 101 Illinois, 46.

But it is equally well settled that, in the absence of any local statute or usage, a grant of lands by the State does not pass title to submerged lands below high water mark; *Pollard* v. *Hagan*, 3 How. 212; *Goodtitle* v. *Kibbe*, 9 How. 471; *United States* v. *Pacheco*, 2 Wall. 587; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *Hardin* v. *Jordan*, 140 U. S. 371, 381; *Shively* v. *Bowlby*, 152 U. S. 1, 13; and that this principle also applies to the Great Lakes. *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387; *Hardin* v. *Jordan*, 140 U. S. 371, 382; *Seaman* v. *Smith*, 24 Illinois, 521; *People* v. *Kirk*, 162 Illinois, 138, 146; *Revell* v. *The People*, 177 Illinois, 468, 479.

It is true, as was said by the court in *Shively* v. *Bowlby*, 152 U. S. 1, 13, that if either the language of the grant or long usage under it clearly indicates an intention that waters submerged by the sea shall be included, it is within the power of the sovereign to grant them. But we know of nothing in the way of constant usage with regard to these submerged waters which lends support to the argument of the railroad company that this case is within the exception and not within the general principle of *Shively* v. *Bowlby*. To make usage significant of the proper interpretation of the grant, it should

appear that it was a usage for the railroad company to appropriate such lands without the express consent of the city, but with its silent acquiescence. Undoubtedly such usage might be inferred from repeated appropriations by the railroad without objection from the city authorities. But the facts seem to be that, wherever the railroad has taken such lands, it has done so with the express consent or subsequent ratification of the State or city. Thus the railroad originally entered the city under an ordinance adopted June 14, 1852, giving it the right "to enter said city at or near the intersection of its southern boundary with Lake Michigan, and following the shore on or near the margin of said lake northerly to the southern bounds of the open space known as Lake Park, in front of canal section 15, and continue northerly across the open space in front of said section 15 to such grounds as the said company may acquire between the north line of Randolph street and the Chicago River, . . . upon which said ground shall be located the depot of said railroad," and express permission was given in section three of this ordinance to extend the railroad company's works and "fill out into the lake to a point on the southern pier not less than four hundred feet west from the present east end of the same."

In *Illinois Central Railroad* v. *Rucker*, 14 Illinois, 353, it was held that the company had the right *by its charter* to locate its road over these premises, *the city having consented to such location.* That was an application by the railroad company for the condemnation of certain lands along the water front. The petitioner alleged that the railroad had been located and was to be constructed in the waters of the lake, along the margin, in front of the premises of the land owners, and partly over the same. One of the defences was that the corporation had no power to locate its road in the waters of Lake Michigan, and that the premises in question were a part of the harbor of Chicago and an encroachment thereon. Counsel for the road took the position that the State had, by the express words of the charter, given to the company authority to locate its road in the waters of the lake. The opinion

is very brief, and the report of the case unsatisfactory, but the court did hold that the company had the right by its charter to locate the road over the premises in question, the city having assented. In the case under consideration the Supreme Court took the view that the controversy in that case concerned only the 200 feet strip for the location of the main track; that no question was raised or decided in regard to the right of the railroad company to go beyond the 200 feet right of way, and take submerged lands for an engine house or other purposes named in the charter. This is entirely true; at the same time it is difficult to see wherein authority to take this 200 feet strip is distinguishable from an authority to take such other submerged lands as are necessary for the complete operation of the road. It is highly probable that, if the case had been presented in the light of subsequent authorities, a different conclusion might have been reached. It is sufficient to say of the *Rucker case*, however, that the city was no party to the litigation, having expressly consented to the location of the main track, and that it is in no sense estopped by the adjudication. It was entirely competent for the Supreme Court in the instant case to take a different view of the law.

It would appear that, prior to 1869, other encroachments had been made upon these submerged lands, and upon April 16, 1869, the General Assembly by an act condoned these encroachments, and declared that the right of the company "under the grant from the State in its charter . . . and under and by virtue of its *appropriation, occupancy, use and control* . . . in and to the lands submerged," was confirmed, a procedure which seems to have been quite unnecessary upon the present theory of the railroad company that it has a perpetual right under its charter to take such submerged lands as were necessary for its complete operation. *McAuley* v. *Columbus, Chicago &c. Central Railway*, 83 Illinois, 352.

The position here taken, that the grant of the railroad company did not include the submerged lands along the lake shore, is not in conflict with the New York cases, which related

to submerged lands admittedly belonging to private parties. In the principal case, *In the Matter of New York &c. Railroad Companies*, 77 N. Y. 248, the proceeding was for the condemnation of lands in the city of New York, along the Hudson River, a large portion of which was under water. It was held that, so far as they belonged to private parties, they might be condemned, but so far as the lands formed a part of the streets and avenues of the city, the company could not acquire title to them, for the reason that they belonged to the city and were for the benefit of the public, citing *People* v. *Kerr*, 27 N. Y. 188. It was also held that, so far as respected the lands of private parties, the fact that they were submerged made no difference. In *Staten Island Rapid Transit Co.*, 103 N. Y. 251, it appeared that the statute authorizing the formation of railroad corporations empowered them to acquire lands, under the right of eminent domain, not only from individuals, but also from the State: but, as observed by the court in the opinion, all questions as to the right of a railroad company to acquire lands under navigable waters, as against the State, were excluded from the controversy. In the case of *Kerr* v. *West Shore Railroad*, 127 N. Y. 269, it was held that proceedings taken by the company to acquire a right of way across plaintiff's lands were effectual to vest in the company whatever title plaintiff had in the upland or in the land under the waters of the river, but it was said in the opinion to be familiar law that the shores of navigable rivers and streams, and the lands under the waters thereof, belong to the State, and may be appropriated by the State to all municipal purposes.

The grant of "waters" in the second sentence of section three is, as shown by the context, still less decisive of an intent on the part of the legislature to make a general grant of the waters of Lake Michigan. By the first sentence of this section power is given to the corporation to appropriate land not exceeding two hundred feet in width through its entire length, and "to enter upon and take possession of and use all and singular any lands, *streams* and materials of every kind for the location of depots and stopping places,

etc., . . . for the complete operation of said road;" and by the second sentence "all such lands, *waters*, materials and privileges, belonging to the State, are hereby granted to said corporation for the said purposes, . . . provided that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said *streams*." Obviously the words "such waters" in the second sentence is limited to the "streams" specified in the first sentence, and power was given to the railroad company to take possession of such streams for the purpose of constructing bridges, dams, embankments, excavations, station grounds, etc., upon the theory that the navigable streams of the State could not be bridged, diverted or encroached upon, except with the express authority of the State. The object of the section was evidently to confer such authority, subject, of course, to the navigation laws of the United States. *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 683 ; *Illinois River &c. Packet Co.* v. *Peoria Bridge Asso.*, 38 Illinois, 467 ; *Chicago* v. *McGinn*, 51 Illinois, 266.

The word "streams" was evidently used to denote running waters, and is wholly inapplicable to a body of water like Lake Michigan. *Trustees of Schools* v. *Schroll*, 120 Illinois, 509. That this was the intention of the legislature is also evident from the proviso of the section " that nothing in this section contained shall be so construed as to authorize the said corporation to interrupt the navigation of said streams." The use of this word "streams" was not only intended to differentiate the waters of rivers from the waters of the lake, but also has its bearing as tending to show that the word " land " was used in the sense of dry lands, or upland, as distinguished from submerged land. It is incredible that, if the General Assembly had intended to authorize the company to take possession of submerged lands, as it found it necessary or convenient so to do, it would not have employed more explicit language to that effect.

3. But even if the grant were as broad as claimed, and gave the company a right to take parcels of submerged land, as it became necessary for its railroad purposes, we are yet con-

strained to hold that it could not do so without the consent of the common council. The eighth section of the charter provides that "nothing in this act contained shall authorize said corporation to make a location of their track within any city, without the consent of the common council of said city." We see nothing in the act from which an intention can be inferred to confine this proviso to the main track of the road, and agree with the Supreme Court of Illinois that it included its depots, engine houses and the necessary track approaches to the same. Such seems to have been the practical construction placed upon it by the city and the railroad company. If the position of the company, that it applies only to the main track, were sound, it would be possible for it, upon establishing the necessity for additional facilities, to locate these engine houses and work shops in localities where they would be an intolerable nuisance to the inhabitants; or perhaps miles, distant from the main line to which approaches would become necessary by tracks laid through populous portions of the city, regardless of the wishes of its constituted authorities.

It is also insisted by the company that this restriction applies only to the city as bounded in 1851, at the date of the charter, and that as the southern limit of the city at that time was Twenty-second street, no such consent is now necessary to be obtained, though the boundaries of the city have long since been extended to a point below the land proposed to be taken. Had the company signified a desire to take possession of these lands before the limits of the city had been extended, it is possible that it might claim a vested right to do so, though the boundaries were subsequently enlarged; but the object of the provision was evidently for the protection of cities in general, and not for the protection of cities as they existed at the date of the charter. The road, as originally constructed, ran through an almost uninhabited country, and yet a country which gave promise of a large population and of great cities being built up along the line of the road; and it is highly improbable that the growth of the State should not have been foreseen and contemplated in this legislation. Indeed, it is impossible to suppose that the legislature intended

that the road, so far as it passed through existing cities, all then insignificant, should be subject to the will of the common council, but so far as it passed through cities that might arise in the future, or existing cities whose boundaries would shortly be enlarged, it abdicated such power.

The case of *Regina* v. *Cottle*, 3 Eng. L. & E. 474, is pertinent in this connection. A turnpike act, passed in 1840, and which was to be in force for thirty-one years, provided that it should not be lawful to continue or erect any turnpike gate across the roads in the town of Taunton, or in any other town through or into which the roads might pass or be made. It was held that the prohibition extended to the erection of a gate within the limits of a town as it existed at any time during the operation of the act, and not merely at the time when the act passed. Said Lord Campbell: "We think the legislature contemplated the probable increase of Taunton within a period longer than that generally assigned for a generation of the human race, and intended that its inhabitants, as it increased, should be exempt from the annoyance of a turnpike gate cutting off the free intercourse between neighbors in the same street. . . . This construction is fortified by the reference 'to any other town through or into which the said roads may pass,' meant, probably, to protect the inhabitants of any new town which might spring up within the district while the act should be in force."

The case of *The People* v. *Deehan*, 153 N. Y. 528, is also apposite in this connection. In that case a grant by the town authorities to an incorporated gas company of a power to lay conductors "for conducting gas in and through the public streets and highways of said town," without any express limitation, was held not to be restricted to existing streets and highways, but to be construed as extending to such as were subsequently enlarged, changed or opened. In delivering the opinion the court observed: "When the right to use the streets has been once granted in general terms to a corporation engaged in supplying gas for public and private use, such grant necessarily contemplates that new streets are to be opened and old ones extended from time to time, and so the privilege may

be exercised in the new streets as well as in the old. Such a grant is generally in perpetuity, or during the existence of the corporation, or at least for a long period of time, and should be given effect according to its nature, purpose and duration."

There is nothing in these cases in conflict with those of *Chope* v. *Detroit & Howell Plank Road Co.*, 37 Michigan, 195, and *Detroit* v. *Detroit & Howell Plank Road Co.*, 43 Michigan, 140, in both of which it was held that a toll gate, lawfully erected upon land which was subsequently taken into the city, could not be declared a nuisance by reason of the extension of the boundaries, and that the same could not be abated without a violation of the Constitution.

In the case under consideration, however, no invasion of the right of property is contemplated. The subjection of the railroad company to the will of the common council deprived the company of nothing it before possessed, but limited the exercise of a right which had not yet become vested and was still subject to the police power. The question is really one of the intention of the General Assembly in incorporating this provision into the charter of the company, and in view of the need of some control of this kind and the condition of the country at the time the charter was adopted, we can have no doubt whatever that the assent of the common council was intended to be required as a permanent condition. Especially is this so in view of the insistence of the railroad company that the power to appropriate these submerged lands is a continuing one. In such case the condition upon which the power should be exercised, namely, the consent of the common council, should also be construed as continuous. In other words, the railroad company cannot assert the power and in the same breath repudiate the condition.

In conclusion, we are of opinion that the decree of the Supreme Court of Illinois was clearly right, and it is therefore

*Affirmed.*