was useful to look when he did, and that he had his horses under such control that he could have arrested their progress. He must have judged that by looking as he did he could have avoided the train by stopping or turning aside his horses. Palmer states that he saw him "as he came towards the railroad crossing, or the track," and later says,. "At that time I was about hitting the first rail." If this means that the wagon was at the east rail, the horses could not have reached the south-bound track. There is no evidence that he hurried or delayed after looking. The horses were not injured. The wagon was struck, so he must have driven his wagon in front of the locomotive knowing that it was very near to him. I cannot discover that his driving in front of the locomotive was a constraining alternative, nor that it was a. mere error of judgment. He had eight people in his care, and the result of the accident shows the necessity for caution. There is suffi-cient evidence that the gates were up. But that did not excuse lack of care on his part. But even if their condition invited his passage,. even if it could be said that such condition tended to lessen his care, the fact remains that he was not lulled into security, but, disregarding the suggestion of a safe passage, he sought to ascertain for himself. The learned counsel for the plaintiff justifies him as follows:

"The evidence which was submitted to the jury on this branch of the case was to the effect that, at the time in question, the driver was sober, and was a temperate, competent driver, of years of experience; that as he approached the crossing he looked to the right and the left for coming trains, notwith-standing the fact that the crossing gates were up, and he was relieved from the necessity of using as great care as would have been required of him in going upon a railroad track at a crossing not protected by gates, and a flag-man; yet, the positive evidence is that he did look both ways at least once. This shows that the possibility of danger was in his mind as he approached the track, and that he was alert to discover the presence of danger. He was driving at a jog trot, about five miles per hour, a pair of good, strong, docile livery horses, with a heavy load of nine persons, including himself, in the wagon. There was no noise in the wagon to prevent his hearing a train. As he looked once, it is reasonable to suppose that, the matter being on his mind, he looked more than once, although neither of the two survivors of the acci-dent saw him but once."

This argument may exculpate him for not earlier discovering the train; but it confirms my conclusion that when he did look he was con-scious of possible danger, was "alert to discover" it, and that he did discover it, and chanced passing before the locomotive.

The judgment and order should be reversed, and a new trial granted; costs to abide the event. All concur, except HIRSCH-BERG, P. J., who dissents.

---

ENTON v. CONEY ISLAND & B. R. CO.

(Supreme Court, Appellate Division, Second Department. March 11, 1910.)

1. CARRIERS (§ 20*) — PENALTIES FOR OVERCHARGING PASSENGERS — RIGHT OF ACTION THEREFOR.

Railroad Law (Laws 1890, c. 565) § 39, provides that any railroad cor-poration which shall ask or receive more than the lawful rate of fare, un-less such overcharge was made through inadvertence or mistake not

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

amounting to gross negligence, shall forfeit $50, etc. *Held*, that action would not lie thereunder for a penalty if the overcharge was the result of an honest mistake in the construction of its statutory rights.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 34; Dec. Dig. § 20.*]

2. COURTS (§ 89*) — PREVIOUS DECISIONS AS PRECEDENTS — ISOLATED EXPRESSIONS IN OPINIONS.

Isolated expressions in opinions cited as precedents must be construed with reference to the facts of the case under consideration.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 311; Dec. Dig. § 89.*]

3. RAILROADS (§ 75*)—CONSTRUCTION IN CITY—CONDITIONS IMPOSED BY CITY AUTHORITIES.

Act April 20, 1861 (Laws 1861, c. 324), authorizing the Coney Island & Brooklyn Railroad Company to construct its road, prescribed that permission of the common council to construct the railroad within said city or the consent of the majority of the abutting owners of the property fronting on any street or avenue, through or over which it is proposed to lay the road, should first be obtained. *Held*, that such act operated pro tanto to repeal the provisions of the general railroad law (Laws 1850, c. 140, § 28, subd. 5), under which the company was incorporated, making necessary consent of the city authorities to construction of a railroad in, on, or across streets in any city.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 185; Dec. Dig. § 75.*]

4. EVIDENCE (§ 73*)—CONSTRUCTION AND OPERATION OF RAILROAD—PRESUMPTION OF LAWFUL CONSENT.

When a railroad has been constructed and operated for a long period of years. it is presumed such construction and operation were in accordance with some lawful consent.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 94; Dec. Dig. § 73.*]

5. CARRIERS (§ 20*) — PENALTY FOR OVERCHARGING PASSENGERS — ACTION THEREFOR—BURDEN OF PROOF.

Where there are two acts or ordinances under which a railroad may operate within city limits, one of which imposes no restriction as to rate of fare and the other does, if action is brought under Railroad Law (Laws 1890, c. 565) § 39, to recover the penalty for excessive fare charged, the burden of proof is on plaintiff, who asserts the charge to be illegal, to establish by a fair preponderance, under which defendant is operating.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 48; Dec. Dig. § 20.*]

Appeal from Municipal Court, Borough of Brooklyn, First District.

Action by Louis B. Enton against the Coney Island & Brooklyn Railroad Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Argued before WOODWARD, JENKS, BURR, THOMAS, and RICH, JJ.

Robert Stewart, for appellant.

William N. Dykman (Vine H. Smith, on the brief), for respondent.

BURR, J. This action is brought to recover a penalty under the railroad law (Laws 1890, c. 565, § 39), which provides that:

"Any railroad corporation, which shall ask or receive more than the lawful rate of fare, unless such overcharge was made through inadvertence or

───────────────────────────────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mistake, not amounting to gross negligence, shall forfeit fifty dollars, to be recovered with the excess so received by the party paying the same."

If defendant was not justified in demanding the fare paid by plaintiff, it might be urged with much force that its action was the result of an honest mistake in the construction of its statutory rights. In such case, this action would not lie. Goodspeed v. Ithaca Street Railway Co., 184 N. Y. 351, 77 N. E. 392. We prefer, however, to put our decision upon a broader ground. Defendant was incorporated in December, 1860, under the general railroad law, which provided that nothing in the act contained should "authorize the construction of any railroad not already located in, upon or across any streets in any city, without the assent of the corporation of such city." Laws 1850, c. 140, § 28, subd. 5. In its articles of incorporation the termini of the road were stated to be a point in and upon Coney Island in the town of Gravesend, and a point in the city of Brooklyn at or near the Fulton Ferry. The distance from Fulton Ferry to the city limits, as they existed at the time of its incorporation and for many years thereafter, was a little more than five miles, and the distance from the city limits to Coney Island was a little more than six miles. That portion of the route outside of the limits of the city of Brooklyn was through the towns of Flatbush, Flatlands, and Gravesend. By various acts of the Legislature, the towns above mentioned were incorporated with and became part of the city of Brooklyn. Laws 1894, c. 356; Id., c. 449; Id., c. 450.

Plaintiff contends that defendant is operating its road under a consent of the common council of the city of Brooklyn, which was on condition that "the fare to be charged by said company for carrying passengers within the city limits shall not exceed the fare now authorized and determined by this common council for the Brooklyn City Railroad Company" (which it was conceded was five cents), and that when the limits of the city were extended this provision became operative through the annexed territory, so that at the time specified in the complaint defendant was not justified in charging more than five cents fare for one continuous trip between the terminus of the road at Coney Island and the terminus of the road at Fulton Ferry. We have carefully examined every authority cited by plaintiff in support of his contention, and such others as we have been able to find, and there is no case in this or in any of our sister states which may be deemed conclusively to uphold the same. There are, it is true, isolated expressions in the opinions in some of the cases which point in that direction. But such language must be construed with reference to the facts of the case under consideration. Colonial City Traction Co. v. Kingston City R. R. Co., 154 N. Y. 493, 48 N. E. 900.

Two well-considered cases hold to the contrary. People ex rel. Chope v. Detroit & Howell Plank Road Co., 37 Mich. 195, 26 Am. Rep. 512; City of Detroit v. Detroit & Howell Plank Road Co., 43 Mich. 140, 5 N. W. 275. In the former case, which was a proceeding by a bill in equity to abate a nuisance, it appeared that the charter of the defendant authorized it to erect tollgates at its discretion, provided none should be placed within the limits of the city of Detroit. Defendant had erected a tollgate upon the line of its road, which, at the

time of its erection, was without the city limits. Subsequently the boundaries of the city were extended so as to include the locus in quo. The old gate having become dilapidated and out of repair, defendant started to erect a new one, and this action was brought to enjoin it. from so doing. The court said:

"When the state gave the company the right to build their road from a point in the city, and the right to erect gates according to their reasonable discretion, but subject to the condition that none should be placed in the city, it contemplated the city as it then was in respect to limits, and meant that. the privilege given within the city should not extend so far as to allow gates to be set up there, and, on the other hand, that the restriction should be confined territorially to the then fixed and known bounds of the city. The state could not have designed that, as fast as it might enlarge the city boundaries, the defendant's franchise covering the right to place tollgates should be correspondingly annihilated, and the gates themselves, thereby brought within the limits, be instantly converted into a public nuisance."

After the decision in this case, and evidently with a view of overcoming the effect thereof, an act was passed (Pub. Laws 1879, p. 197) which, among other things, provided that:

"No plank-road company * * * shall, without the consent of the local authorities, keep or maintain a tollgate within the present or future corporate limits of any city, or village; * * * and if any plank-road company or companies in this state are, at the time of the passage of this act, maintaining any tollgate within the present corporate limits of any city or village, said plank-road company or companies, are hereby required to discontinue and remove said tollgate beyond the limits of said city or village, within sixty days after they are notified by the municipal authorities to so discontinue or remove the same."

The city of Detroit then brought a mandamus proceeding (the second action above referred to) to compel the company to remove a tollgate which was outside of the city limits at the time of its erection, but which at the time when the proceeding was instituted was within the limits of the city as extended. Chief Judge Cooley, in an opinion concurred in by the entire court, held this act unconstitutional, although the general act under which defendant was incorporated contained a clause relating to the power of future amendment by the Legislature. The court said:

"But there is no well-considered case in which it has been held that a Legislature, under its power to amend a charter, might take from the corporation any of its substantial property or property rights. * * * It cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may rightfully have acquired. * * * It is immaterial in what way the property was lawfully acquired; whether by labor in the ordinary vocations of life, by gift or descent, or by making profitable use of a franchise granted by the state. It is enough that it has become private property, and, it is then protected by the 'law of the land.'"

Without discussing all of the cases cited by the learned counsel for the plaintiff, the principal ones are: Illinois Central R. R. Co. v. Chicago, 176 U. S. 646, 20 Sup. Ct. 509, 44 L. Ed. 622; People ex rel. Chicago v. Chicago Telephone Co., 220 Ill. 238, 77 N. E. 245; Indiana Railway Co. v. Hoffman, 161 Ind. 593, 69 N. E. 399; St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121.

In the Illinois Central Railroad Case, which was an action brought

by the city to enjoin the railroad company from constructing an engine house and other necessary structures appertaining thereto for the use of the road, over and across submerged lands of Lake Michigan, the court held in the first place that the grant to the company was not sufficiently broad to authorize it to appropriate and take possession of the lands in question. It is true the court said, if its grant were sufficiently broad to cover such lands, in view of a further provision therein that nothing contained in the act should authorize said corporation to make a location of their track within any city without the consent of the common council, that it could not make such location over lands which were within the boundaries of the city at the time that the act of location was attempted, although not within the boundaries of the city at the time that the charter was passed. But in that connection the court said:

"Had the company signified a desire to take possession of these lands before the limits of the city had been extended, it is possible that it might claim a vested right to do so, though the boundaries were subsequently enlarged."

Much more must this be the case if the company had not only signified a desire to take possession of such lands, but had actually done so. The court said further:

"There is nothing in these cases in conflict with those of Chope v. Detroit & Howell Plank Road Co., 37 Mich. 195 [26 Am. Rep. 512], and Detroit v. Detroit & Howell Plank Road Co., 43 Mich. 140 [5 N. W. 275], in both of which it was held that a tollgate, lawfully erected upon land which was subsequently taken into the city, could not be declared a nuisance by reason of the extension of the boundaries, and that the same could not be abated without a violation of the Constitution."

In the Chicago Telephone Company Case, consents had been given to the company by the authorities of towns and villages lying without the city limits to the erection of poles and the stringing of wires for telephone purposes. These consents contained no limitation as to rates. At about the same time a consent for a similar purpose was given to the same company by the municipal authorities of the city of Chicago, which did contain such limitation. Subsequently the boundaries of the city were extended, and this action was brought in the nature of quo warranto to declare a forfeiture of the right of the telephone company because it was charging rates in the annexed territory in excess of that provided in the city ordinance. This case turned upon a construction of the consents given by the town and village authorities, and the court held that by the terms thereof they were limited by the corporate life of such towns or villages, and that, inasmuch as after annexation the company had no right to retain the use of the streets in the annexed territory except under the general ordinance of the city of Chicago, the defendant could not be heard to say "it will retain streets which it concedes it has no right to occupy except under the ordinance, and will not comply with the conditions of the ordinance."

In the Indiana Railway Company Case, the action was brought to recover a penalty for refusing to issue a transfer to a person who boarded its car at a point within the limits of the old city of South Bend, but whose destination was a point in territory annexed to the

city after the resolutions authorizing the road to operate had been passed. Originally consent had been obtained from the city of South Bend for so much of the route as was within the city limits, and from the commissioners of St. Joseph county for so much of it as was without the same. The former required the giving of transfers; the latter did not. It appeared that subsequently to annexation, in an action pending between the railroad company and the city of South Bend, the company had made a written proposition of settlement, and agreed as a part thereof to issue transfer tickets free of charge to all persons requesting the same, who might board the cars at any point upon any of its lines within the limits of the city, and whose destination might be any point upon any other line of the company's road within said limits. This proposition was accepted and the action discontinued. The court said:

"It is apparently insisted by counsel for appellant that the city of South Bend, by annexing the part of the territory in which appellant, under the grant from the board of commissioners, had previously operated its road, abrogated and destroyed its rights acquired by said grant, and therefore violated our fundamental laws. But whatever rights appellant had in said territory under its grant from the board of commissioners were not impaired or destroyed by the extension of the city boundary in question, but were changed by its agreement with the city to issue transfer tickets over its lines therein to all points within the city limits. Whatever rights it had to decline or refuse to issue transfers to persons carried over its road in said territory were merged in and controlled by the contract which it subsequently made with the city. If appellant desired to stand upon and avail itself of the rights which it had acquired in the territory in question, it ought not to have entered into the agreement and contract with the city in regard to the rate of fare and the right of passengers to transfer. The regulation of the question of fare and the transfer tickets to be issued rests upon the contract in this case between appellant and the city of South Bend."

In the St. Louis Gaslight Company Case, the decision was put on the ground of estoppel. For a long period of years the gaslight company had asserted and successfully maintained its exclusive right to furnish gas in the territory annexed to the old city, by reason of a contract made by it with the city before annexation, which contract contained a provision both giving it an exclusive privilege of furnishing gas in the city of St. Louis and its suburbs, and regulating the price to be charged. The court held that, as the only basis for its claim of such exclusive right must be found in the ordinance in question, if that ordinance conferred upon the company such right, it must also be held to the conditions contained in it as to the price to be charged.

Not only does the doctrine contended for by the appellant appear to be without express support by any case decided within this state, but in one case, decided by this department, there is a strong intimation to the contrary. People ex rel. Brooklyn Union Gas Co. v. Littleton, 110 App. Div. 728, 96 N. Y. Supp. 444. In that case the court say:

"To sustain the order which this appeal brings up for review, it is not necessary to assert the broad doctrine that a franchise to light the streets of a city extends with the enlargement of the city so as to embrace territory not within its boundaries when the franchise was originally granted. That doctrine finds support in some of the language in the case of St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, although there was an element of estoppel in that case sufficient of itself to sustain the conclusion reached. We should

hesitate to affirm this order, however, if the adoption of this principle were necessary to uphold the position of the relator in the present case."

We are not prepared, therefore, to hold that the condition as to rates of fare contained in the resolution above referred to extended beyond the limits of the city as it existed when it was given. But, in addition to that, the evidence in this case fails to establish that the right of defendant to operate its road rests upon the consent above referred to. Shortly after its incorporation, defendant, in accordance with the provisions of the railroad law, applied to the common council of the city of Brooklyn for consent to operate over that portion of its route which began at Fifteenth street in the said city, from a point at or near its intersection with the Brooklyn & Coney Island Plank Road, and continued through various streets and avenues to Fulton street. The last street specified was Water street, between Catherine Ferry and Fulton street. Water street intersected Fulton street at Fulton Ferry. A resolution granting such consent was adopted December 28, 1860, but was vetoed by the mayor upon the ground that permission had previously been given to another company to lay tracks on Water street from Main to Fulton street, and that if two companies were permitted to lay tracks in the same street the public interests would thereby be made to suffer. No action was taken to override the veto, but on the 21st of January, 1861, the common council passed another resolution in which defendant's right to operate was made to terminate at Catherine Ferry, instead of Fulton Ferry, thereby excluding Water street. It was this consent which attempted to fix the rate of fare within the city limits. This consent, among other things, also contained conditions as to the character of rail to be used and the method of construction of the road, and required the giving of a bond in the sum of $10,000 on the part of the railroad company before any proceedings should be taken under it.

On April 20, 1861, the Legislature passed an act entitled "An act to authorize 'The Coney Island and Brooklyn Railroad Company' to construct their road, and to lay thereon rails of less weight than required by the general railroad act, and to widen and reconstruct the bridge at Coney Island." Laws 1861, c. 324. By that act defendant was authorized to construct and operate its road from Fulton Ferry to a point in and upon Coney Island, upon "streets, roads and avenues designated and shown on maps or profile of said railroad made by Jarvis Whitman, city surveyor, and to lay thereon iron rails of a less weight than prescribed by the said general railroad law," after "having first obtained the permission of the common council of said city to construct said railroad within the said city, or the consent of a majority of the owners of property fronting upon any street or avenue in said city, through or over which it is proposed to lay said railroad." This act contained no provisions as to rate of fare to be charged. This act operated pro tanto to repeal the provisions of the general railroad law relative to obtaining the consent of the city authorities. Brooklyn City & Newtown R. R. Co. v. Coney Island & Brooklyn R. R. Co., 35 Barb. 364. The consent of a majority of the owners of abutting property was equally sufficient.

There is no evidence in this case from which we may determine under which authority defendant constructed its road. There is no evidence that the bond required by the consent of the common council was ever given. There is no evidence when the actual construction of the road began. There is no evidence with regard to the weight and character of the rails, and whether they were such as required by the general railroad law and the consent of the common council, or whether they were such as were permitted by the special act. There is evidence that the road was constructed through Water street. It may be urged that there is no evidence of any consent by a majority of the property owners upon any of the streets or avenues within the city, nor of any consent of any local authorities outside of the old city limits. It does not appear that the latter consent was essential. But when a road had been constructed and operated for a long period of years, a presumption will arise that such construction and operation were in accordance with some lawful consent. People ex rel. N. Y. & R. Gas Co. v. Cromwell, 89 App. Div. 291, 85 N. Y. Supp. 878; Paterson & Passaic H. R. Co. v. Mayor, etc., of Paterson, 24 N. J. Eq. 158. Where, as in this case, there are two acts or ordinances under which defendant may operate within the city limits, one of which imposes no restriction as to rate of fare and the other of which contains such restriction, if an action is brought to recover the penalty for excessive fare charged, the burden of proof rests upon plaintiff who asserts the charge to be illegal to establish by a fair preponderance of evidence under which authority defendant is operating. This case is barren of such evidence.

The judgment appealed from should therefore be affirmed, with costs. All concur.