The second category requires some factual development. The plaintiffs in Mountain States and Tulare County brought such claims when they asserted that the national monuments, as a factual matter, "lack[ed] scientific or historical value." Tulare County, 306 F.3d at 1142. The same is true of those plaintiffs' claims that the monuments' size was not "the smallest area compatible with the proper care and management of the objects to be protected." Id. Courts cannot adjudicate such claims without considering the facts underlying the President's determination. See Mountain States, 306 F.3d at 1134. The availability of judicial review of this category of claims thus stands on shakier ground. Id. at 1133 (declining to decide "the availability or scope of judicial review" of such claims because doing so was unnecessary to resolve the case); see also Dalton v. Specter, 511 U.S. 462, 474, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). What is clear about this category, however, is that review would be available only if the plaintiff were to offer plausible and detailed factual allegations that the President acted beyond the boundaries of authority that Congress set. See Mountain States, 306 F.3d at 1137 (emphasizing that courts should be "necessarily sensitive to pleading requirements where, as here, [they are] asked to review the President's actions under a statute that confers very broad discretion on the President and separation of powers concerns are presented").
The Lobstermen assert both types of claims here. Their allegations that the submerged lands of the Exclusive Economic Zone are not "land" under the Antiquities Acts and are not "controlled" by the federal government fall into the first category. The Court can undoubtedly review these claims and decide whether the President acted within the bounds of his authority. Plaintiffs' allegations that the land reserved as part of the monument is not the "smallest area compatible" with monument management, however, lie in the second category. While the availability and scope of review of such claims are unsettled, the Court need not venture into those uncharted waters because it concludes that Plaintiffs have not offered sufficient factual allegations to succeed.
As a quick aside, under either circumstance, the Court's rejection of Plaintiffs' argument results in dismissal under Rule 12(b)(1), rather than Rule 12(b)(6). In concluding that Plaintiffs failed to demonstrate that the President acted outside his statutory authority, the Court holds, at least as a formal matter, that Plaintiffs' claims are not subject to further judicial review. Such a determination, as best the Court can tell, is jurisdictional. See Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 494 (D.C. Cir. 1988) (concluding that district court "was without jurisdiction to review" plaintiff's claims because government acted within its statutory authority). Regardless, whether properly deemed a dismissal under Rule 12(b)(1) or Rule 12(b)(6), the Court's analysis would be the same.
With that preface, the Court moves on to the claims themselves.
B. Lands
The Lobstermen first contend that the Northeast Canyons and Seamounts Marine National Monument is per se invalid because it lies entirely in the ocean. The Antiquities Act authorizes monuments on "lands" controlled by the federal government, they say, and the Atlantic Ocean is obviously not "land." See ECF No. 41 (Pl.
*56 Opp.) at 11-14. While the argument admittedly has some surface appeal, it is buffeted by the strong winds of Supreme Court precedent, executive practice, and ordinary meaning. The Court examines these and one last issue sequentially.
1. Precedent
Take precedent first. The Supreme Court has thrice concluded that the Antiquities Act does reach submerged lands and the water associated with them. In Cappaert, the Court addressed a dispute about a pool of water in the Devil's Hole, a cavern near Death Valley. See 426 U.S. at 131, 96 S.Ct. 2062. After some discussion, it concluded that the pool and groundwater beneath it were properly reserved under the Antiquities Act as part of the Death Valley National Monument. Id. at 141-42, 96 S.Ct. 2062.
The Court next addressed the matter in California, 436 U.S. 32, 98 S.Ct. 1662. There, it considered whether California or the federal government had dominion "over the submerged lands and waters within the Channels Islands National Monument." Id. at 33, 98 S.Ct. 1662. It began by emphasizing that "[t]here can be no serious question ... that the President in 1949 had power under the Antiquities Act to reserve the submerged lands and waters ... as a national monument." Id. at 36, 98 S.Ct. 1662. It explained that "[a]lthough the Antiquities Act refers to 'lands,' this Court has recognized that it also authorizes the reservation of waters located on or over federal lands." Id. n.9 (citing Cappaert, 426 U.S. at 138-42, 96 S.Ct. 2062 ). The Court went on to conclude for other reasons that title to the lands had subsequently passed to California. Id. at 37, 98 S.Ct. 1662.
Finally, just over a dozen years ago, the Court considered how the Antiquities Act applies to submerged lands in Alaska v. United States, 545 U.S. 75, 125 S.Ct. 2137, 162 L.Ed.2d 57 (2005). The relevant issue in that case, like in California, was whether Alaska or the federal government had title to the submerged lands in Glacier Bay off the coast of Alaska. Id. at 78, 125 S.Ct. 2137. The Court concluded that the federal government had title, in necessary part because those submerged lands were lawfully part of the Glacier Bay National Monument. Id. at 101-02, 125 S.Ct. 2137. The Court separately emphasized that "[i]t is clear ... that the Antiquities Act empowers the President to reserve submerged lands." Id. at 103, 125 S.Ct. 2137 (citing California, 436 U.S. at 36, 98 S.Ct. 1662 ). In all three opinions, then, the Court affirmed that the Antiquities Act authorizes presidents to declare submerged lands like the canyons and seamounts as national monuments.
Not so fast, Plaintiffs say: those opinions' discussions of the Antiquities Act, they believe, are dicta. See Pl. Opp. at 13 n.4. The Court disagrees, at least as to Alaska. In that case, the Supreme Court applied a two-part test to determine whether the federal government had title to the submerged lands: first, it asked whether the federal government had properly reserved the land; second, it inquired whether the federal government had demonstrated an intent to defeat the state's title to the land. While the Supreme Court did not rely on the monument designation to demonstrate the federal government's intent to defeat Alaska's title (step two), it affirmatively relied on the designation to demonstrate that the federal government had reserved the lands originally (step one). See 545 U.S. at 100-02, 125 S.Ct. 2137. Indeed, the Court went out of its way to emphasize that its conclusion to that effect was "a necessary part of the reasoning." Id. at 101, 125 S.Ct. 2137. Its decision that the submerged lands in Glacier Bay were indeed lands under the Antiquities *57 Act was thus a holding, not dictum. In any event, "[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." NRDC v. NRC, 216 F.3d 1180, 1189 (D.C. Cir. 2000) (quoting United States v. Oakar, 111 F.3d 146, 153 (D.C. Cir. 1997) ). This Court is loath to hold otherwise and thus sticks with the Supreme Court's admonition that "the Antiquities Act empowers the President to reserve submerged lands." Alaska, 545 U.S. at 103, 125 S.Ct. 2137.
2. Practice
In light of those decisions, it should come as no surprise that past presidents have frequently reserved submerged lands as national monuments. In addition to the Devil's Hole, Channel Islands, and Glacier Bay monuments, presidents have declared, among others, the Fort Jefferson National Monument off the coast of Florida, see 49 Stat. 3430 (1935), the Buck Island Reef National Monument off the Virgin Islands, see 76 Stat. 1441 (1961), and the Papahanaumokuakea Marine National Monument off the coast of Hawaii. See 72 Fed. Reg. 10,031 (Feb. 28, 2007) ; see also Administration of Coral Reef Resources in the Northwest Hawaiian Islands, 24 Op. O.L.C. 183, 186-200 (2000) (Office of Legal Counsel opinion explaining Executive understanding that Antiquities Act extends to submerged lands in ocean). That history supports interpreting the Act to reach submerged lands. See Zemel v. Rusk, 381 U.S. 1, 11 & n.8, 85 S.Ct. 1271 (1965). Accentuating the persuasiveness of the Executive's longstanding interpretation, Congress recodified the Antiquities Act with minor changes in 2014 but without modifying the Act's reach. See N. Haven Bd. of Ed. v. Bell, 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (explaining that Congress's acquiescence to agency's construction in amending statute suggests agency has "correctly discerned" the "legislative intent") (quoting United States v. Rutherford, 442 U.S. 544, 554 n.10, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) ).
Plaintiffs contend that this executive practice and the precedents sustaining it do not control the circumstances of this case. They argue, in short, that those past monuments should be distinguished because they are not confined to submerged lands, but also include some non-submerged lands. See Pl. Opp. at 25-26. Why this would make a difference for the purpose of construing the word "land" in the Antiquities Act escapes the Court; it apparently escapes Plaintiffs as well, for their Opposition fails to explain the salience of the distinction. What seems in escapable is that if the submerged lands in Glacier Bay are "lands" under the Antiquities Act, so are the submerged canyons and seamounts in the Atlantic Ocean.
3. Ordinary Meaning
What this Court has already said should be enough to settle the matter of defining lands under the Antiquities Act. A few brief words are nonetheless warranted in response to Plaintiffs' argument that "[t]he ordinary meaning of 'land' excludes the ocean." Pl. Opp. at 11. In support of that assertion, they cite several definitions of "land" from dictionaries published in the Rooseveltian era that define it in opposition to "ocean." Id. at 12 (citing, e.g. , Webster's New International Dictionary (1st ed. 1909) ). Of course, it is true that the world is roughly divided up into dry land, on the one hand, and ocean on the other. But what about that part of the earth that lies beneath the seas? It is not dry land, to be sure; yet ordinary parlance would seem to deem places like the ocean floor and the beds of lakes and streams land. As it turns out, the dictionaries Plaintiffs cite would *58 agree. Webster's First includes "land under water" as a proper use of the word "land." Webster's New International Dictionary at 1209. Black's Law Dictionary likewise defines land as "any ground soil, or earth whatsoever," including "everything attached to it ... [such] as trees, herbage, and water." Black's Law Dictionary at 684 (1st ed. 1891). If that were not enough, the Supreme Court has offered the following commentary directly on point:
[T]he word "lands" includes everything which the land carries or which stands upon it, whether it be natural timber, artificial structures, or water, and that an ordinary grant of land by metes and bounds carries all pools and ponds, non-navigable rivers, and waters of every description by which such lands, or any portion of them, may be submerged, since, as was said by the court in Queen v. Leeds & L. Canal Co. 7 Ad. & El. 671, 685: "Lands are not the less land for being covered with water."
Ill. Cent. R.R. Co. v. Chicago, 176 U.S. 646, 660, 20 S.Ct. 509, 44 L.Ed. 622 (1900) (emphases added). That should settle it: The Antiquities Act reaches lands both dry and wet.
4. National Marine Sanctuaries Act
But wait. Plaintiffs offer one last argument why the Antiquities Act does not reach submerged lands in the oceans. They say that such a reading would conflict with the National Marine Sanctuaries Act, which gives the Executive Branch the authority to designate certain areas of the marine environment as "national marine sanctuaries" and to issue regulations protecting those areas. See Pl. Opp. at 26-33 (citing 16 U.S.C. § 1431 et seq. ). The Court understands them to be making two separate arguments in that regard. First, they say that the Sanctuaries Act impliedly repealed the Antiquities Act, at least as it applied to the oceans. Id. at 26. Second, they posit that Congress's decision to pass the Sanctuaries Act sheds light on its understanding that oceans are excluded from the reach of the Antiquities Act. Id. at 26-33. Neither argument, so to speak, holds water.
Take the implied-repeal contention first. It is axiomatic that "repeals by implication are not favored." Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). Courts do not "infer a statutory repeal 'unless the later statute expressly contradicts the original act' or unless such a construction 'is absolutely necessary in order that the words of the later statute shall have any meaning at all.' " Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (formatting modified) (quoting Traynor v. Turnage, 485 U.S. 535, 548, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) ). Plaintiffs, moreover, do not attempt to make the kind of showing required for an implied-repeal argument. And for good reason. Not only does the Sanctuaries Act fail to mention the Antiquities Act, but it also expressly provides that it is intended to "complement[ ] existing regulatory authorities." 16 U.S.C. § 1431(b)(2).
The post-enactment-intent argument similarly provides the Lobstermen's boat little headway. It is true, as they note, that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." Pl. Opp. at 29 (quoting FDA v. Brown & Williamson, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ). But subsequent acts may also "provid[e] overlapping sources of protection," intended to complement earlier enactments. See Mountain States, 306 F.3d at 1138 ; see *59 also United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (statutes "may be merely affirmative, or cumulative, or auxiliary"). Such was the case in Mountain States. There, the plaintiffs argued that "the specific provisions of the numerous environmental statutes adopted in the years following enactment of the Antiquities Act," including the Endangered Species Act and the Wilderness Act, demonstrated that Congress did not intend for the Antiquities Act to address similar environmental values. See Brief for Appellant, 2002 WL 34504965, Mountain States, 306 F.3d 1132 (No. 01-5421). They believed that those more specific enactments provided "the sole mechanisms by which certain environmental values were to be protected." Id. The Court disagreed, explaining that the argument "misconceives federal laws as not providing overlapping sources of protection." 306 F.3d at 1138. In other words, the subsequent environmental statutes provided the Executive Branch with a targeted way of addressing similar environmental concerns - the fact that Congress subsequently expanded the Executive's tools to protect the environment, however, did not invalidate Congress's prior authorization to the Executive to designate national monuments. Id.
The Court concludes that, as in Mountain States, the Antiquities Act's reach is unaffected by subsequent statutory enactments such as the Sanctuaries Act. As the Court interprets them, both Acts address environmental conservation in the oceans. Yet they do so in different ways and to different ends. Begin with the purposes of the Acts. The Antiquities Act is entirely focused on preservation. The Sanctuaries Act, on the other hand, addresses a broader set of values, including "recreation[ ]" and the "public and private uses of the [ocean] resources." 16 U.S.C. §§ 1431(a)(2), 1431(b)(6). In line with their different purposes, the Acts' regulatory tools also vary. The Antiquities Act provides presidents with a blunt tool aimed at preserving objects of scientific or historic value. The Sanctuaries Act, on the other hand, offers a targeted approach, incorporating feedback from a host of stakeholders and reflecting more tailored conservation measures. See 16 U.S.C. § 1434(a)(5) (outlining procedures and explaining that commercial fishing, among other private uses, generally permitted). Contrary to Plaintiffs' argument, then, the Court's interpretation of the Antiquities Act does not render the Sanctuaries Act redundant. Far from it. Like the Endangered Species Act in Mountain States, the Sanctuaries Act gives the President an important, but more targeted, implement to achieve an overlapping, but not identical, set of goals.
Considered in the broader context of Congressional involvement in marine conservation, Plaintiffs' post-enactment-intent argument faces another problem. When Congress passed the Sanctuaries Act in 1972, it acted on a backdrop of presidential practice establishing national monuments on submerged lands, aimed at conserving natural resources. See e.g., 53 Stat. 2534 (1939) (Glacier Bay Expansion); 76 Stat. 1441 (1961) (Buck Island Reef). If the later Congress had a narrower understanding of the Antiquities Act's reach, as Plaintiffs contend, it might be expected to have expressly amended or repealed the Act when it passed the Sanctuaries Act. It did not do so. See supra at 57-58. The natural inference from Congress's silence is not that it intended to change the Antiquities Act's reach, but that it intended to keep it the same.
These circumstances, among others, also show why Plaintiffs' reliance on FDA v. Brown & Williamson Tobacco, 529 U.S. at 133, 120 S.Ct. 1291, is misplaced. Much simplified, the question in that case was *60 whether the FDA could regulate tobacco. Id. In concluding that it could not, the Supreme Court emphasized that the FDA had made "consistent and repeated statements that it lacked authority" to regulate tobacco, id. at 144, 120 S.Ct. 1291, and Congress had subsequently passed several more specific statutes regulating tobacco, thereby "ratify[ing] the FDA's prior position that it lacks jurisdiction." Id. at 158, 120 S.Ct. 1291. This case is different. Here, as mentioned, Congress enacted the Sanctuaries Act against the backdrop of the Executive's position that the Antiquities Act reaches submerged lands. So, if the Sanctuaries Act ratified anything, it was the Executive's understanding that the Act reaches certain submerged lands.
Finally, while on the subject of later Congresses' intents, it is worth emphasizing again that the legislature recodified the Antiquities Act with several small amendments in 2014 without altering its scope. By that point, more presidents had declared marine national monuments, and several of those monuments had been sustained by the Supreme Court. See supra at 55-58. The response from Congress? Silence. Had later Congresses understood the Antiquities Act not to reach submerged lands in the oceans or the Sanctuaries Act to alter the Antiquities Act, as Plaintiffs contend, one might expect them to have effectuated that understanding somewhere in the U.S. Code.
* * *
The Court, accordingly, rejects Plaintiffs' argument that this Monument exceeds the President's authority under the Antiquities Act because it lies entirely beneath the waves.
C. Control
With plenty of bait left, the Lobstermen next argue that the Monument is invalid because the Government does not adequately "control" the Exclusive Economic Zone, the sector of the ocean where the Monument lies. Recall that presidents may only declare national monuments on land "owned or controlled by the Federal Government." 54 U.S.C. § 320301(a). Plaintiffs contend that the Antiquities Act requires the federal government to maintain "complete" control over the area, and that the Government lacks such control over the EEZ. See Pl. Opp. at 14. This argument hauls in no more catch than Plaintiffs' prior one about submerged lands. The Court starts by explaining why it disagrees with Plaintiffs' interpretation of "control" before articulating why it concludes that the federal government adequately controls the EEZ for purposes of the Act.
1. "Complete" Control
Plaintiffs contend that the phrase "lands owned or controlled by the federal government" should be interpreted to mean "lands owned or completely controlled by the federal government." See Pl. Opp. at 14-15. The Court cannot concur. The ordinary meaning of the word, backed by statutory context and Supreme Court precedent, demonstrates that Congress meant something less than complete control.
The Court starts with the plain meaning of the word "control." Relying on definitions from Webster's First Dictionary, Plaintiffs argue that "control" means "to exercise complete dominion." Id. at 14. Webster's First defines control as follows: "To exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb; subject; overpower." Webster's New International Dictionary at 490. None of the definitions they cite supports Plaintiffs' understanding. Most of the definitions, including "to exercise directing influence, regulate, hold *61 from action, curb," clearly indicate something less than absolute control. But even the most favorable definitions for Plaintiffs - e.g. , "to dominate and overpower" - arguably suggest something less than complete control. Consider a simple example: If a technology investor said that IBM "dominated" the market for laptop computers, one would not understand her to mean that it "exercised complete dominion" over the market. Rather, she would be understood to say that IBM is the unrivaled leader in the market, though other companies continue to compete with it. Replace dominate with control and the meaning remains largely the same. Far from supporting Plaintiffs' understanding of control, the dictionary definitions thus suggest a broader interpretation of the term.
In response, the Lobstermen invoke several canons of interpretation. They first raise noscitur a sociis - the rule that "a word is known by the company it keeps." Gustafson v. Alloyd Co., 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Because "controlled" is grouped with the word "owned," Plaintiffs argue it should refer to the same degree of control as ownership. See Pl. Opp. at 15. The Court is unpersuaded. Rejecting a nearly identical contention, the Supreme Court has explained that "[t]he argument seems to assume that pairing a broad statutory term with a narrow one shrinks the broad one, but there is no such general usage." S.D. Warren Co. v. Maine Bd. of Environmental Protection, 547 U.S. 370, 379, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) ; see also Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson, 559 U.S. 280, 288-89, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) ("[T]hree items ... [are] too few and too disparate to qualify as string of statutory terms.") (internal quotation marks and citation omitted). Just as the Supreme Court refused to apply noscitur a sociis to narrow the broader term in a two-term list, S.D. Warren, 547 U.S. at 379-81, 126 S.Ct. 1843, this Court rejects application of the canon here. Indeed, the Lobstermen's noscitur a sociis argument is weaker even than the one rejected in S.D. Warren. There at least, the two-term list was conjunctive - i.e. , separated by an "and." Id. at 379, 126 S.Ct. 1843. Here, Congress separated ownership and control with the word "or," whose use "is almost always disjunctive, that is, the words it connects are to be given separate meanings." Loughrin v. United States, 573 U.S. 351, 134 S.Ct. 2384, 2390, 189 L.Ed.2d 411 (2014) (quoting United States v. Woods, 571 U.S. 31, 45, 134 S.Ct. 557, 187 L.Ed.2d 472 (2013) ). Just so here, for control and ownership "are distinct concepts." Dole Food Co. v. Patrickson, 538 U.S. 468, 477, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003). A statutory canon focused on "identifying a common trait that links all the words" is thus particularly inapplicable. See Yates v. United States, --- U.S. ----, 135 S.Ct. 1074, 1097, 191 L.Ed.2d 64 (2015) (Kagan, J., dissenting).
Not dissuaded, Plaintiffs next invoke the rule against surplusage. See Pl. Op. at 15. They say that a broader interpretation of the term "control" - to mean something less than absolute dominion - would render irrelevant the term "owned." Id. But Plaintiffs' interpretation does not resolve any surplusage problem. Assuming "control" requires "the same degree of control" as ownership, see Pl. Opp at 15, the term "ownership" is equally irrelevant as it would be under a broader understanding of "control." The Court thus rejects the surplusage argument. See Bruesewitz v. Wyeth LLC, 562 U.S. 223, 236, 131 S.Ct. 1068, 179 L.Ed.2d 1 (2011) (rejecting surplusage argument that did not resolve surplusage problem).
*62 Somewhat more interesting, though ultimately just as unpersuasive, are Plaintiffs' legislative-history arguments. See Pl. Opp. at 15-17. In that regard, they note that earlier versions of the Antiquities Act used the phrase "public lands," rather than "lands owned or controlled by the United States." Compare 54 U.S.C. § 320301(a)with S. 5603, 58th Cong. (1904). Plaintiffs contend that the change was precipitated by one senator's remark in a subcommittee hearing on an earlier version of the Bill. See Preservation of Historic and Prehistoric Ruins, Hearing before the Subcomm. of the Senate Committee on Public Lands, 58th Cong. Doc. No. 314, at 24 (1904). There, Senator Fulton had the following exchange with the Commissioner of Indian Affairs:
Senator FULTON: I suppose the public lands would include these Indian reservations?
Commissioner Jones: No; I think not.
Senator FULTON: They are public lands, although the Indians have possession.
Commission JONES: Take the Southern Ute Reservation in the case cited-
Senator FULTON: Still the Government has control absolutely.
Id.
Plaintiffs maintain that this exchange, taken with the change in the final Bill's language, demonstrates that by "control," Congress meant "absolute control." Pl. Opp at 16. This argument encounters any number of problems. For one, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history," Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), particularly where the record lacks "evidence of an agreement among legislators on the subject." Rivers v. Roadway Exp., Inc., 511 U.S. 298, 308-09 n.8, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Here, Plaintiffs present no persuasive evidence that Senator Fulton's statement, insofar as it in fact reflected his view and correctly described the law, embodied Congress's view of the matter. The Bill was ultimately passed by a different Congress several years after the hearing in question, with no substantiated connection between Senator Fulton's statement and the language of the final Bill.
A second problem is that Senator Fulton's remark is highly equivocal. Based on the hearing transcript, Fulton appeared to interrupt Commissioner Jones to answer his own question, stating that Indian reservations "are public lands." 58th Cong. Doc. No. 314, at 24 (emphasis added). Indeed, when Jones was subsequently asked whether the proposed bill would allow the Interior Department to protect artifacts on Indian lands, he replied, "I think this bill will cover it[.]" Id. One reading of the exchange is that Fulton and Jones agreed that the proposed Bill's coverage of public lands would include Indian lands. If that were so, it would mean the addition of the phrase "lands controlled by the federal government" did not arise from this exchange. The takeaway is that the isolated comments Plaintiffs pick out are, to put the matter generously, equivocal and therefore unreliable evidence of legislative intent.
Even if Plaintiffs were correct that the proposed Bill was amended to ensure the Act covered Indian lands, that would not mean that "control" means "absolute control." Contrary to Senator Fulton's statement, the federal government did not (and does not) maintain absolute control over Indian lands. The Supreme Court said as much in United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) : "[A] reviewing court must recognize that tribal lands are subject to Congress' power to control and *63 manage the tribe's affairs. But the court must also be cognizant that 'this power to control and manage [is] not absolute.' " Id. at 415, 100 S.Ct. 2716 (emphasis added) (quoting United States v. Creek Nation, 295 U.S. 103, 109, 55 S.Ct. 681, 79 L.Ed. 1331 (1935) ); see also American Indian Law Deskbook § 3.8 (May 2018) ("Tribes and individual Indians have acquired significant control over their land and its resources."). So, even if Congress had in mind the level of control the federal government had over Indian lands when it added the word "control" to the Antiquities Act, it would not support Plaintiffs' "absolute control" interpretation.
The more persuasive interpretation of "control" does not require inserting an adjective in front of the word to achieve a desired meaning. See EEOC v. Abercrombie & Fitch Stores, Inc., --- U.S. ----, 135 S.Ct. 2028, 2033, 192 L.Ed.2d 35 (2015) ("The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result."). Instead, it tracks the ordinary understanding of the term, as discussed above and as reflected in the way the Supreme Court has used the term. The Court's decision in California is a good example. Recall that the Court in that case affirmed that the federal government "controlled" the waters in the territorial sea, supporting the President's authority to establish the Channel Islands National Monument. See 436 U.S. at 36, 98 S.Ct. 1662 (discussing United States v. California, 332 U.S. 804, 805, 68 S.Ct. 20, 92 L.Ed. 382 (1947) ). Even Plaintiffs appear not to contest that the federal government controls the territorial sea. Yet that control is neither "complete" nor "absolute." States may exercise their police powers there. See United States v. Louisiana, 394 U.S. 11, 22, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969). Other nations have "the right of innocent passage" through that territory - viz. , passage that "is not prejudicial to the peace, good order, or security of the coastal state." Restatement (Third) of Foreign Relations Law § 513 (last updated June 2018). When it stated that the federal government "controlled" the territorial sea, California, 436 U.S. at 36, 98 S.Ct. 1662, the Court thus had in mind something short of absolute control; it instead understood the term to mean something closer to, in dictionary parlance, "to exercise directing or restraining influence over." Webster's First at 490.
Additional instances abound of the courts' and Congress' defining areas of the ocean like the territorial sea and beyond as under federal-government control. See, e.g., Outer Continental Shelf Lands Act, 43 U.S.C. § 1331(a) (defining outer continental shelf in part as submerged lands subject to federal "jurisdiction and control"); see also Native Vill. of Eyak v. Trawler Diane Marie, Inc., 154 F.3d 1090, 1091 (9th Cir. 1998) (acknowledging "sovereign control and jurisdiction of the United States to waters lying between 3 and 200 miles off the coast"). The bottom line: Plaintiffs are wrong when they assert that the Antiquities Act only extends to lands the federal government completely controls. The voyage is not over, however. This determination still leaves open the question of whether the government has enough influence over the Exclusive Economic Zone under the Antiquities Act to constitute "control," which issue the Court turns to next.
2. Control of the EEZ
Three considerations convince the Court that the federal government sufficiently controls the Exclusive Economic Zone - where the Northeast Canyons and Seamounts National Marine Monument is located - to empower the President under *64 the Antiquities Act. First, the federal government exercises substantial general authority over the EEZ, managing natural-resource extraction and fisheries' health and broadly regulating economic output there. Second, it possesses specific authority to regulate the EEZ for purposes of environmental conservation. Third, no private person or sovereign entity rivals the federal government's dominion over the EEZ.
Some background to start. Customary international law, which is ordinarily deemed binding federal law in the United States, sets forth the rights and responsibilities of nations in different parts of the oceans and their corresponding seabeds. See Restatement (Third) of Foreign Relations Law § 511, Cmt. D; see also The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). Abutting the coastline of the United States lies the territorial sea, a body of water extending up to twelve nautical miles from the coast. See Restatement (Third) of Foreign Relations Law § 511(a). Beyond the territorial sea is the EEZ, which "may not exceed 200 nautical miles" from the point at which the territorial sea is measured. Id. § 511(d). To refresh the reader, the Monument at issue lies about 130 miles off the coast of New England, and Plaintiffs do not dispute that it plainly sits within the EEZ. See Compl., ¶ 2.
Consistent with international law, President Reagan established the EEZ out to 200 nautical miles in 1983. See Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983). In that Proclamation, he claimed for the United States the authority recognized under international law, including: (1) the sovereign right to "explor[e], exploit[ ], conserv[e] and manag[e] natural resources, both living and non-living, of the seabed and subsoil and superadjacent waters"; (2) the rights to pursue "other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds"; (3) "jurisdiction with regard to the establishment and use of artificial islands, and installations and structures having economic purposes"; and (4) the responsibility for "protection and preservation of the marine environment." Id. The Government therefore possesses broad sovereign authority to manage and regulate the EEZ. That wide-ranging authority obviously tips the scale towards finding that it controls the EEZ under the Antiquities Act.
Second, the federal government has the specific authority to regulate the EEZ for purposes of marine conservation. As President Reagan explained in his proclamation, the federal government maintains in the EEZ "jurisdiction with regard to ... the protection and preservation of the marine environment." Id. International law likewise acknowledges the federal government's ability to issue and enforce laws and regulations related to marine conservation in the EEZ. See Restatement (Third) of Foreign Relations Law § 514, Cmt. i; see also U.N. Convention on the Law of the Sea, e.g. , Art. 65 (affirming coastal nation's rights to regulate marine mammals in EEZ for purposes of marine conservation), Arts. 61-62 (providing for coastal nation's responsibilities for fishery management and conservation).
This specific authority exists not just on paper. Rather, the federal government exercises close management and regulation of marine environments in the EEZ. One way it does so is through the National Marine Sanctuaries Act, mentioned above. See 16 U.S.C. § 1431 et seq. Under that Act, the federal government declares marine sanctuaries in the EEZ, over which it exercises "authority for comprehensive and coordinated conservation and manage ment *65 ." Id. § 1431(b)(2) (emphases added). Another is through fisheries management under laws like the Magnuson-Stevens Act. Id. § 1801 et seq. One purpose of that Act is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States ... by exercising (A) sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone." Id. § 1801(b)(1) (emphases added). Of course, such enactments do not on their own give the federal government the power to establish national monuments in the EEZ - only the Antiquities Act can do that. But they shed light on what kind of control the federal government exercises over the EEZ. As the Court sees it, the fact that the federal government maintains and exercises specific authority under domestic and international law to "protect the marine environment in the EEZ" strongly suggests that Congress would have understood the Government to maintain the requisite level of control under the Antiquities Act. See 24 Op. O.L.C. at 197 (suggesting that federal government's ability to regulate marine environments essential to question of control of EEZ under Antiquities Act).
Third, the federal government's control over the EEZ is unrivaled. As explained, the United States exercises sovereign rights there for a host of purposes, including natural-resource extraction, fisheries management, marine conservation, and the establishment of artificial islands. No other person or entity, public or private, comes close to matching the Government's dominion over that area - whether for the purposes discussed already or for any others. That matters a great deal for understanding the sufficiency of the Government's control over the EEZ. For just as control can be defined by the presence of dominion or authority over something, so the absence of control can be underscored by the presence of someone else's dominion or authority over that same thing. That no one else challenges the federal government's control over the EEZ thus suggests that it possesses, rather than lacks, control of the area.
Yet, as discussed earlier, the Government does not claim to exercise complete control over the EEZ. Other nations may exercise "the freedoms of navigation and overflight" there, as well as the "freedom to lay submarine cables and pipelines." Restatement (Third) of Foreign Relations Law § 514(2). But those limitations on U.S. control in the EEZ are not all that different from those in the territorial sea, which the Supreme Court has affirmed is controlled by the federal government. See California, 436 U.S. at 36, 98 S.Ct. 1662 (discussing California, 332 U.S. at 805, 68 S.Ct. 20 ). In the territorial sea, as mentioned, foreign ships maintain "the right of innocent passage" - defined as passage that is "not prejudicial to the peace, good order, or security of the coastal state." Restatement (Third) of Foreign Relations Law § 513(1)(a)-(b). Foreign ships thus pass through the territorial sea, just as they pass through the EEZ. More broadly, the presence of foreign ships and undersea cables does not vitiate the other forms of Government control of the EEZ, discussed in detail above.
These three considerations demonstrate that, under any of the range of definitions referenced above - to regulate, to dominate, to overpower, to curb, to exercise restraining or directing influence over - the federal government's control here is adequate. It bears mentioning that this conclusion is not novel. In 2000, the Office of Legal Counsel in the Department of Justice - in an opinion drafted by Randolph Moss, now a highly regarded judge in this district - concluded, based on very similar considerations, that the federal *66 government controlled the EEZ for purpose of the Antiquities Act. See 24 Op. O.L.C. at 195-97. The Government thus appears to have maintained for over fifteen years the same understanding prior to the creation of the Monument at issue here. Likewise, several courts, while not deciding the issue raised in this case, have described the EEZ as subject to control of the federal government. See Native Vill. of Eyak, 154 F.3d at 1091 (United States has "sovereign control and jurisdiction ... to waters lying between 3 and 200 miles off the coast"); R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 965 n.3 (4th Cir. 1999) (United States has "exclusive control over economic matters involving fishing, the seabed, and the subsoil"). Even Congress has described the area as "subject to [federal] jurisdiction and control." 43 U.S.C. § 1331(a). This Court can be added to that list. For all the reasons outlined, the federal government controls the EEZ for purposes of the Antiquities Act.
3. Plaintiffs' Counterarguments
Not ready to head back to shore, the Lobstermen offer three arguments to the contrary that the Court has yet to address. First, they claim that interpreting the Antiquities Act to reach the EEZ conflicts with the Fifth Circuit's decision in Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 569 F.2d 330 (5th Cir. 1978). See Pl. Opp. at 33-34. The Court disagrees for two reasons. For one, that decision predated President Reagan's Proclamation establishing U.S. control over the EEZ. While the federal government had previously claimed dominion over the area's minerals, see Proclamation No. 2667, 10 Fed. Reg. 12,303 (Oct. 2, 1945), it had not yet claimed the broader authority discussed in detail above. The non-binding case might well have come out differently had it occurred after Reagan's proclamation.
For another, that decision addressed the Antiquities Act's reach with respect to a historic - rather than a scientific - object. As the Office of Legal Counsel has explained, the Government might well have the authority to declare a scientific object in the EEZ to be a national monument to advance conservation goals, yet lack the authority to declare a historic object one to advance historic-preservation goals. See 24 Op. O.L.C. at 196. That is because the Government possesses the sovereign right to regulate the EEZ for purposes of marine conservation, which the Court found persuasive above, yet lacks any sovereign right to regulate or salvage historic objects there. While the Court need not decide the matter, the upshot is that the Fifth Circuit's decision could be correct if decided today and still have no bearing on this Court's conclusion that the President may establish this national monument in the EEZ.
Second, Plaintiffs maintain that the Antiquities Act cannot reach certain territory that was not controlled by the United States when the Act was passed in 1906. See Pl. Opp. at 17-18. But Congress did not freeze the Act's coverage in place in 1906. Rather, by referring to "lands controlled by the U.S. Government," the legislature intended for the Act's "reach [to] change[ ] as the U.S. Government's control changes." 24 Op. O.L.C. at 191. In line with that understanding, Presidents have declared national monuments in areas that were not under U.S. control in 1906. See, e.g., Proclamation No. 3443, 76 Stat. 1441 (1961) (Buck Island in the Virgin Islands). Plaintiffs concede that "Congress anticipated the federal government obtaining additional lands within categories covered by the Act," but insist that Congress did not want the Act to extend to "areas that were categorically ineligible for federal ownership or control in 1906." Pl. Opp. at *67 17-18. Any distinction between the two is illusory. The federal government did not control lands in the Virgin Islands in 1906, but once it gained such control, it could declare national monuments there. Likewise, the federal government did not control the waters from 3 to 200 miles off the coast in 1906, but once it gained such control under international and domestic law, it could declare national monuments there. Plaintiffs offer no evidence that Congress would have intended to treat the EEZ and the Virgin Islands any differently - if expansion in U.S. control and ownership can expand the Act's scope as to one, logically it can expand the Act's scope as to the other.
The Lobstermen finally resort to a classic slippery-slope argument: If the Act reaches the EEZ, it could reach anywhere, up to and including private property. Id. at 20-21. Plaintiffs can rest easy: The slope, assuming there is one, has plenty of traction. To start, the Court does not understand the Antiquities Act to reach anywhere the Government can regulate. Such a reading would indeed expand the Act's scope to a host of private lands outside the Government's control. Rather, in concluding that the Antiquities Act reaches the EEZ, the Court has emphasized that the Government possesses broad dominion over the area, that it possesses specific regulatory authority over the subjects of the Monument, and that its authority there is unrivaled. The last point particularly addresses Plaintiffs' concern about private property. Had a private person or entity exercised some control or ownership over the EEZ, that would indicate the federal government lacked the requisite control over the area. See supra at 65-66. In all, the Court's narrow reading of "land controlled by the federal government" poses few of the hurricane-is-coming concerns Plaintiffs raise.
D. Smallest Area
Finally nearing harbor, the Court addresses Plaintiffs' fact-specific arguments about the boundaries of the Monument. Recall that the Antiquities Act requires monuments to be "confined to the smallest area [of land] compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). But to obtain judicial review of claims about a monument's size, plaintiffs must offer specific, nonconclusory factual allegations establishing a problem with its boundaries. See Mountain States, 306 F.3d at 1137. Plaintiffs allegations here do not rise to that level.
The Lobstermen offer the following factual allegations about the Monument's size: (1) "The monuments['] boundaries bear little relation to the canyons and seamounts, thereby prohibiting much fishing outside of these areas that would have no impact on the canyons, seamounts, or the coral that grows on them. Between Retriever and Mytilus Seamounts, for instance, the monument encompasses areas that are dozens of miles from the nearest seamount. Yet in other areas, the monument's boundary lies right next to a seamount excluding areas that are at most only several miles away"; and (2) "the monument's canyon unit broadly sweeps in the entire area between the canyons, as well as significant area closer to the shore than the canyons." Compl., ¶¶ 73-74. The crux of the Lobstermen's argument seems to be that the Monument reserves large areas of ocean beyond the objects the Proclamation designated for protection. Id. The problem is that this position is based on the incorrect factual assumption that the only objects designated for protection are the canyons and seamounts themselves. The Proclamation makes clear that the "objects of historic and scientific interest" include *68 not just the "canyons and seamounts" but also "the natural resources and ecosystems in and around them." Proclamation at 2. Insofar as Plaintiffs allege otherwise, the Court need not accept such allegations as true because they "contradict exhibits to the complaint or matters subject to judicial notice." Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004).
With that cleared up, it becomes obvious that Plaintiffs' allegations are insufficient. Even if it were true that the Monument's boundaries do not perfectly align with the canyons and seamounts, that would not call into question the Monument's size. As Intervenors explain, the Monument's boundaries presumably align with the resources and ecosystems around them. See ECF No. 44 (Intervenors Reply) at 24. Plaintiffs allege no facts to the contrary.
The Lobstermen insist that the boundaries cannot be based on the ecosystems and natural resources because they are not "objects" under the Antiquities Act. See Compl., ¶ 75. Not according to the D.C. Circuit and the Supreme Court, which have concluded that ecosystems are objects of scientific interest under the Act. See Alaska, 545 U.S. at 103, 125 S.Ct. 2137 ; Cappaert, 426 U.S. at 141-42, 96 S.Ct. 2062 ; Cameron, 252 U.S. at 455-56, 40 S.Ct. 410 ; see also Tulare County v. Bush, 306 F.3d 1138, 1142 (D.C. Cir. 2002) ("Inclusion of such items as ecosystems and scenic vistas in the Proclamation did not contravene the terms of the statute by relying on nonqualifying features."). Plaintiffs also suggest that highly migratory species cannot be designated as monuments under the Act because they are not " 'situated' upon federal lands." Pl. Opp. at 39-40. Their concerns are misplaced: the Proclamation did not designate highly migratory species as objects - it instead so designated the ecosystems surrounding the canyons and seamounts. See Proclamation at 2. Insofar as they might relatedly suggest that the ecosystems are not situated on federal lands, they would be mistaken. As the Proclamation explains, the protected ecosystems are formed by "corals" and "other structure-forming fauna such as sponges and anemones" that physically rest on, and are otherwise dependent on, the canyons and seamounts themselves. Id.
In all, Plaintiffs offer no factual allegations explaining why the entire Monument, including not just the seamounts and canyons but also their ecosystems, is too large. The Court therefore need not undertake further review of the matter.
IV. Conclusion
For these reasons, the Court will grant Defendants' Motion to Dismiss under Rule 12(b)(1). A separate Order so stating will issue this day.